UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RACHEL SILVA, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>AVIVA PLC, et al.,<br><br>        Defendants. | Case No. 15-cv-02665-PSG<br><br>**ORDER GRANTING MOTION TO TRANSFER VENUE AND DENYING WITHOUT PREJUDICE MOTIONS TO DISMISS**<br><br>**(Re:  Docket No. 42, 43, 47)** |

    This case centers on a series of what are known as captive reinsurance transactions.  As Plaintiffs Rachel Silva and Don Hudson see them, these transactions are essentially a shell game, through which insurance companies offload liabilities to their own affiliates to make their balance sheets look better to customers.[1]  Here, Plaintiffs allege, seven corporate Defendants—Aviva plc, along with various related and successor entities—used captive reinsurance transactions to hide long-term liabilities and to defraud Plaintiffs and other customers into buying tens of billions of dollars in overvalued annuities.[2]  Defendants say they did nothing wrong and point out that state regulators approved each and every transaction.[3]

    Now before the court are three motions.  Defendants move to transfer the litigation to the Southern District of Iowa, where several Defendants are based and many of the transactions at

---

[1] *See* Docket No. 1 at ¶¶ 119-201.

[2] *See id.* at ¶¶ 202-529.

[3] *See* Docket No. 47 at 7-10.

1

Case No. 15-cv-02665-PSG
ORDER GRANTING MOTION TO TRANSFER VENUE AND DENYING WITHOUT PREJUDICE MOTIONS TO DISMISS

issue occurred.[4]  Defendant Aviva plc also moves to dismiss for lack of personal jurisdiction,[5] while the remaining Defendants move to dismiss for failure to state a claim.[6]  Because the court finds that this litigation belongs in the Southern District of Iowa, it leaves its colleagues there to reckon with the merits of the dispute.  The motion to transfer venue is GRANTED; the motions to dismiss are DENIED without prejudice to any renewed motion after transfer.

## I.

In 2010, Plaintiffs purchased their annuity products from Aviva Life and Annuity Company.[7]  At the time, ALAC was a subsidiary of Aviva USA Corporation.[8]  Aviva USA was itself owned by Aviva Group Holdings Ltd., which in turn was a subsidiary of Defendant Aviva plc, where the buck finally stopped.[9]  In 2013, Defendant Athene Holding Ltd. acquired Aviva USA and gained control of ALAC.[10]  Aviva USA is now known as Defendant Athene USA Corporation, while ALAC has become Defendant Athene Annuity and Life Company.[11]  ALAC and Aviva USA, as well as their successor entities, are headquartered in Iowa.[12]  Aviva plc is located in London, and Athene Holding is incorporated in Bermuda.[13]

---

[4] *See* Docket No. 43.  Defendant Aviva plc, which is appearing specially to contest personal jurisdiction, has not joined in this motion.

[5] *See* Docket No. 42.

[6] *See* Docket No .47.

[7] *See* Docket No. 1 at ¶¶ 19, 502-503, 507-509.

[8] *See id.* at ¶¶ 20-21.

[9] *See id.* at ¶¶ 18, 21.

[10] *See id.* at ¶ 22.  Athene Holding is itself a subsidiary of Defendant Apollo Global Management, LLC, a Delaware company.  *See id.* at ¶ 25.

[11] *See id.* at ¶¶ 19-20.

[12] *See id.*

[13] *See id.* at ¶¶ 18, 22.

2
Case No. 15-cv-02665-PSG
ORDER GRANTING MOTION TO TRANSFER VENUE AND DENYING WITHOUT
PREJUDICE MOTIONS TO DISMISS

Plaintiffs' complaint describes Defendants' alleged scheme in detail,[14] but the short version is this: Defendants artificially inflated ALAC's bottom line to work around state regulatory requirements and make ALAC's annuity products more attractive to buyers. Annuities are a variety of insurance contract where the buyer pays a premium in exchange for the insurer's promise to make a payment or series of payments in the future.[15] Insurance companies market annuities to seniors as a way to convert their present assets into a future income stream.[16] The insurer's financial condition and, more specifically, its ability to meet its obligations over the long term are key factors in pricing annuities.[17]

Insurers issue public accounting statements so that ratings agencies and consumers can properly evaluate the risk of non-payment.[18] The National Association of Insurance Commissioners, the umbrella organization for insurance regulators in the United States, has set out accounting standards for insurers, and all 50 states require insurance companies to adhere to the NAIC standards.[19] Insurers file annual and quarterly statements with state insurance regulators.[20] Insurers may depart from standard NAIC practices if state law permits, but they then must disclose their accounting practices and explain the financial impact in their annual statements.[21]

State regulators also require insurers to maintain adequate capital on hand to meet their long-term obligations. Insurance companies are evaluated on two metrics: surplus and risk-based

---

[14] *See id.* at ¶¶ 119-529.

[15] *See id.* at ¶ 64.

[16] *See id.* at ¶ 65.

[17] *See id*. at ¶ 68.

[18] *See id.* at ¶¶ 66-68, 85-88.

[19] *See id.* at ¶¶ 69-77.

[20] *See id.* at ¶¶ 78-79.

[21] *See id.* at ¶¶ 80-81.

capital.[22] Surplus derives from a comparison between an insurance company's admitted assets—the assets available for the satisfaction of obligations, excluding those that are unavailable due to encumbrances or other third-party interests—and its liabilities—consisting primarily of promises made to annuitants and policyholders.[23] RBC, a slightly more complex measure, estimates the entire risk of the insurance company, pursuant to a formula prescribed by the NAIC.[24]

As indicated at the outset, Plaintiffs' allegations center on captive reinsurance transactions. In theory, reinsurance transactions allow insurers to send liabilities, such as blocks of life insurance policies or annuities, to other entities.[25] By removing liabilities from its books, the company ceding the liabilities thereby improves its RBC ratio.[26] In an arm's-length reinsurance transaction, the ceding insurer sends assets sufficient to cover the liabilities, so that both companies remain in the same position.[27] Indeed, the RBC formulas assume that reinsurance agreements are reached in this way, so they do not account for the quality of reinsurance.[28]

Plaintiffs allege that Defendants took advantage of this potential gap using what are known as captives. Broadly speaking, captive insurance companies are subsidiary entities created to insure the risks of their parent companies and regulated like any other insurer.[29] Non-insurance companies can use captives for self-insurance and for certain tax benefits.[30] But in recent years,

---

[22] *See id.* at ¶ 89.

[23] *See id.* at ¶¶ 90-102.

[24] *See id.* at ¶¶ 103-118.

[25] *See id.* at ¶¶ 124-127.

[26] *See id.* at ¶ 129. Coinsurance and modified coinsurance transactions work much the same way with respect to the RBC formula. *See id.* at ¶ 130.

[27] *See id.* at ¶¶ 128, 131-133.

[28] *See id.* at ¶ 129.

[29] *See id.* at ¶¶ 137-138.

[30] *See id.* at ¶ 137.

Case No. 15-cv-02665-PSG
ORDER GRANTING MOTION TO TRANSFER VENUE AND DENYING WITHOUT PREJUDICE MOTIONS TO DISMISS

insurance companies themselves have begun creating captives, at first offshore and now in certain states that allow them, like Vermont and Iowa.[31]  According to Plaintiffs, as well as industry commentators and the NAIC itself, captives pose the danger of allowing insurers to transfer away their riskiest assets and liabilities, improving insurers' RBC ratios without actually improving their financial health.[32]

Allegedly, Defendants did just that.  Starting in 2007, ALAC entered into a series of reinsurance and modified coinsurance transactions with its own wholly owned affiliates and took reserve credits for these transactions.[33]  Over the next five years, each of ALAC's annual statements reported a surplus and a favorable RBC ratio, but these numbers masked billions of dollars of reserve credits arising from captive reinsurance transactions.[34]  In late 2012, Aviva plc, the British parent company, agreed to sell off Aviva USA and ALAC in late 2013 to Apollo, a private equity firm, at what Plaintiffs allege was a bargain-basement price.[35]  Afterwards, under the new ownership, ALAC engaged in a new series of captive reinsurance transactions to satisfy solvency and stability requirements.[36]

This complex scheme, Plaintiffs contend, was very profitable to Defendants.  Between 2007 and the filing of the complaint in 2015, ALAC and its successor sold $29 billion of individual annuities alone.[37]  That income flowed from ALAC to its parent companies and

---

[31] *See id.* at ¶¶ 139-146.

[32] *See id.* at ¶¶ 147-156, 163-198.

[33] *See id.* at ¶¶ 229-300.

[34] *See id.* at ¶¶ 236-300.

[35] *See id.* at ¶¶ 301-304, 311-312, 316-319.

[36] *See id.* at ¶¶ 323-446.

[37] *See id.* at ¶¶ 211-213, 451.

5
Case No. 15-cv-02665-PSG
ORDER GRANTING MOTION TO TRANSFER VENUE AND DENYING WITHOUT PREJUDICE MOTIONS TO DISMISS

affiliates through dividends, investment fees, sham investments and other such arrangements.[38] After the acquisition, Apollo began to swap ALAC's stable, long-term investments for riskier assets like mortgage-backed securities, making it even less likely that ALAC would be able to pay out on its annuities but further improving ALAC's short-term balance sheet.[39] Apollo and the Athene entities now seek to cash in on ALAC's superficially strong performance through an IPO of ALAC's parent, Athene Holding.[40]

Plaintiffs claim that they have sustained damages in the form of the inflated prices for the annuities they bought—prices they never would have paid had they known ALAC's true financial state.[41] Because they say that every other ALAC annuity buyer in the United States suffered the same injury, Plaintiffs seek to represent all of them in a class action.[42] They allege that Defendants used interstate mail and wires in selling these annuities to Plaintiffs and in misrepresenting their financial condition.[43] Accordingly, Plaintiffs' complaint includes two causes of action, both for violation of the Racketeer Influenced and Corrupt Organizations Act.[44]

## II.

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. The parties further consented to the jurisdiction of the undersigned magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 72(a).[45]

---

[38] *See id.* at ¶¶ 452-473.

[39] *See id.* at ¶¶ 474-498.

[40] *See id.* at ¶¶ 499-501.

[41] *See id.* at ¶¶ 502-514.

[42] *See id.* at ¶¶ 570-575.

[43] *See id.* at ¶¶ 517-519.

[44] *See id.* at ¶¶ 576-585; 18 U.S.C. § 1962(c), (d).

[45] *See* Docket Nos. 10, 25, 26, 32.

6
Case No. 15-cv-02665-PSG
ORDER GRANTING MOTION TO TRANSFER VENUE AND DENYING WITHOUT PREJUDICE MOTIONS TO DISMISS

## III.

Under 28 U.S.C. § 1404(a), a district court may transfer any civil action "to any other district or division where it might have been brought" for the convenience of parties and witnesses. The purpose of the statute is to "prevent the waste 'of time, energy, and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'"[46] In deciding whether to transfer, the court first must examine whether federal venue rules would have allowed the action to be brought in the district to which transfer is sought.[47] Here, Plaintiffs do not dispute that they could have brought this action in the Southern District of Iowa.[48]

The court must therefore move on to an "individualized, case-by-case consideration of convenience and fairness."[49] Courts have characterized the heart of the issue as looking to which forum has the "center of gravity,"[50] which forum has the closest connection to the "operative facts"[51] or which forum has the most "significant connection" to the dispute.[52] In addition to the

---

[46] *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (quoting *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 26-27 (1960)).

[47] *See id.* at 623; *Cung Le v. Zuffa, LLC*, 108 F. Supp. 3d 768, 773 (N.D. Cal. 2015) (citing *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985)).

[48] *See* Docket No. 68-6 at 11. In any event, the RICO venue provision provides that venue is proper in the district "in which [the defendant] resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). Athene Annuity and Athene USA (and their predecessors, ALAC and Aviva USA) are domiciled in and transact affairs at their headquarters in the Southern District of Iowa. The general venue statute further provides that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). The alleged RICO predicate acts pled in the complaint concern the captive reinsurance transactions and how they were accounted for and reported. These transactions— including the actuarial methodology and calculations, accounting and financial reporting of the transactions—were developed and effectuated in the Southern District of Iowa. *See* Docket No. 44 at ¶ 6.

[49] *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen*, 376 U.S. at 622).

[50] *GLT Technovations, LLC v. Fownes Bros. & Co.*, Case No. 12-cv-00466, 2012 WL 1380338, at *4 (N.D. Cal. Apr. 20, 2012) (quoting *Teknekron Software Sys., Inc. v. Cornell Univ.*, Case No. 93-cv-20122, 1993 WL 215024, at *7 (N.D. Cal. June 14, 1993)).

[51] *Hawkes v. Hewlett-Packard Co.*, Case No. 10-cv-05957, 2012 WL 506569, at *4 (N.D. Cal.

factors that Section 1404(a) identifies—namely, "the convenience of parties and witnesses"—"the court may consider: (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof."[53] The district court has wide discretion in weighing these factors, and no single factor is dispositive.[54] The moving party bears the burden of showing that transfer would be appropriate.[55]

On balance, Defendants have carried that burden. To begin, Defendants identify a number of significant connections to the Southern District of Iowa. Two important Defendants, ALAC and Aviva USA, were headquartered and domiciled in that district, as are their successors.[56] All of the purportedly fraudulent transactions occurred there,[57] even accepting Plaintiffs' evidence that higher-ups elsewhere directed or approved them.[58] The actuarial methodology and calculations

---

Feb. 15, 2012) (quoting *Hernandez v. United States*, Case No. 07-cv-05501, 2009 WL 666947, at *3 (N.D. Cal. Mar. 13, 2009)).

[52] *Ventress v. Japan Airlines*, 486 F.3d 1111, 1118-19 (9th Cir. 2007).

[53] *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000).

[54] *See Stewart*, 487 U.S. at 29; *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979); *Cung Le*, 108 F. Supp. 3d at 774 (quoting *Ctr. for Biological Diversity v. Kempthorne*, Case No. 08-cv-01339, 2008 WL 4543043, at *2 (N.D. Cal. Oct. 10, 2008)).

[55] *See Commodity Futures*, 611 F.2d at 279 (citing *Starnes v. McGuire*, 512 F.2d 918, 925 (D.C. Cir. 1974) (en banc)).

[56] *See* Docket No. 1 at ¶¶ 19-20. Their executives, actuaries and accounting functions are all located at their headquarters in the Southern District of Iowa. *See* Docket No. 44 at ¶¶ 3-4.

[57] *See* Docket No. 44 at ¶ 6.

[58] *See* Docket No. 68-10; Docket No. 68-14 at AVIVAPLC-00001012; Docket No. 68-22; Docket No. 68-24 at AVIVAPLC-00000070 to -000000082.

and accounting for those transactions, as well as other reinsurance transactions, took place in the Southern District of Iowa.[59]

And although Plaintiffs' claims are grounded in federal law, they clearly and primarily implicate decisions by the Iowa Insurance Division, who approved every disputed captive reinsurance transaction under the law of Iowa.[60]  In addition, the complaint provides details about accounting treatments permitted by the state of Iowa.  For example, the reported surplus for non-party Cape Verity I was, according to Plaintiffs, "possible as a result of the State of Iowa allowing" an accounting practice.[61]  Similarly, non-party Accordia Life and Annuity Company could report a positive book value "because the Iowa Insurance Commissioner permitted [it] to depart from NAIC statutory accounting practices."[62]  The complaint thus puts the role and actions of Iowa insurance regulators and Iowa law directly in dispute.

Defendants also point to the convenience of witnesses and, relatedly, the ease of access to sources of proof.  The convenience to witnesses, and especially to non-parties, is considered one of the most important factors in deciding a motion to transfer.[63]  Here, that critical factor cuts

---

[59] *See* Docket No. 44 at ¶¶ 6, 10.

[60] *See, e.g.*, Iowa Code § 521A.5 (setting standards for reinsurance transactions).

[61] Docket No. 1 at ¶ 382; *see also id.* at ¶ 400 (same for Cape Verity II); *id.* at ¶ 417 (same for Cape Verity III).

[62] *Id.* at ¶¶ 338, 431-432.

[63] *See Global Hawk Ins. Co. v. Vega*, Case No. 15-cv-02093, 2015 WL 7720801, at *4 (N.D. Cal. Nov. 30, 2015) (citing *Clark v. Sprint Spectrum L.P.*, Case No. 10-cv-03625, 2010 WL 5173872, at *3 (N.D. Cal. Dec. 15, 2010)); *Integrated Global Concepts, Inc. v. j2 Global, Inc.*, Case No. 12-cv-03434, 2014 WL 2931125, at *4 (N.D. Cal. June 27, 2014); *Machado v. CVS Pharmacy, Inc.*, Case No. 13-cv-04501, 2014 WL 631038, at *4 (N.D. Cal. Feb. 18, 2014); *Park v. Dole Fresh Vegetables, Inc.*, 964 F. Supp. 2d 1088, 1095 (N.D. Cal. 2013) (quoting *Bunker v. Union Pac. R.R. Co.*, Case No. 05-cv-04059, 2006 WL 193856, at *2 (N.D. Cal. Jan. 23, 2006)); *see also Enjaian v. Univ. of Mich. Dep't of Pub. Safety*, Case No. 12-cv-03924, 2012 WL 4717879, at *3 (N.D. Cal. Oct. 2, 2012); *Johns v. Panera Bread Co.*, Case No. 08-cv-01071, 2008 WL 2811827, at *4 (N.D. Cal. July 21, 2008) (listing cases in which court transferred action based on location of witnesses).

strongly towards the Southern District of Iowa. Defendants have submitted evidence that a number of potentially important witnesses live in or near Des Moines, including seven non-parties who previously worked for Defendants as well as the Iowa regulators who approved the transactions.[64] Plaintiffs dispute whether some of these non-parties have any connection to this litigation. But Defendants' list includes quite a few former high-level executives, and in fact three of these non-parties are mentioned by name in Plaintiffs' complaint.[65] These non-party witnesses outside of a jurisdiction cannot be subpoenaed to obtain their testimony for trial.[66] Nor do depositions solve this problem—"for trial, live testimony is as a general matter preferable over deposition excerpts."[67] On the other hand, Plaintiffs do not identify any non-party witness who is local to this district. All told, Defendants have shown that several key factors weigh heavily in favor of transfer.

By contrast, Plaintiffs rely primarily on a single connection to this forum: the fact that Silva chose to sue in the district where she lives. True, a plaintiff's choice of forum ordinarily plays a major role in the Section 1404(a) analysis, and particularly so when she resides in her chosen district.[68] But this is a class action suit, where "a plaintiff's choice of forum is often accorded less weight."[69] Silva resides in this district and purchased her annuity policy elsewhere

---

[64] *See* Docket No. 44 at ¶¶ 7-8.

[65] *See* Docket No. 1 at ¶¶ 41, 43-44.

[66] *See* Fed. R. Civ. P. 45(c)(1); *Machado*, 2014 WL 631038, at *4.

[67] *Wilson v. Walgreen Co.*, Case No. 11-cv-02930, 2011 WL 4345079, at *4 (N.D. Cal. Sept. 14, 2011) (citation omitted).

[68] *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."); *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986) ("The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum."); *Roling v. E*Trade Sec., LLC*, 756 F. Supp. 2d 1179, 1185-86 (N.D. Cal. 2010).

[69] *Roling*, 756 F. Supp. 2d at 1185 (citing *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987)); *In re Ferrero Litig.*, 768 F. Supp. 2d 1074, 1078 (S.D. Cal. 2011) (citing *Lou*, 834 F.2d at 739).

in California,[70] but most putative class members—including Hudson, the other named Plaintiff, who lives in Oklahoma[71]—have no reason to prefer this forum.  Giving due consideration "to the extent of both [Plaintiffs'] and [Defendants'] contacts with the forum, including those relating to [Plaintiffs'] cause of action,"[72] and even though there is no indication that Plaintiffs engaged in forum shopping, the court finds that Plaintiffs' decision to sue in this district has only limited significance.[73]  The aforementioned connections to the Southern District of Iowa outweigh Plaintiffs' choice of this forum.[74]

---

[70] *See* Docket No. 1 at ¶ 15.

[71] *See id.* at ¶ 16.

[72] *Lou*, 834 F.2d at 739.

[73] *See Graham v. VCA Antech, Inc.*, Case No. 14-cv-02158, 2014 WL 5528402, at *2-3 (N.D. Cal. Oct. 31, 2014) (finding that class action plaintiffs' "choice of forum [was] entitled to little weight," even though one of two named plaintiffs resided in this district); *Ruiz v. Darigold, Inc.*, Case No. 14-cv-02054, 2014 WL 4063002, at *2-3 (N.D. Cal. Aug. 14, 2014) (giving "substantially reduced" weight to class action plaintiffs' choice of forum, even though a named plaintiff resided in this district, where "the majority of witnesses and the evidence [were] located in Washington"); *Johns*, 2008 WL 2811827, at *2-3 (granting "little deference" to plaintiffs' choice of forum in a putatively nationwide class action, even though one named plaintiff resided in this district); *see also Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947) ("[W]here there are hundreds of potential plaintiffs, . . . all of whom could with equal show of right go into their many home courts, the claim of any one plaintiff that a forum is appropriate merely because it is his home forum is considerably weakened.").

[74] *Cf. Gresser v. Wells Fargo Bank*, Case No. 11-cv-06175, 2012 WL 1094338, at *7 (N.D. Cal. Mar. 29, 2012) (noting that while defendants provided evidence about the relevance of certain witnesses, plaintiffs "offered no information about the convenience of witnesses in this case" beyond a single named plaintiff in a nationwide class action); *see also Kysone v. Regis Corp.*, Case No. 14-cv-01410, 2014 WL 2959483, at *4 (N.D. Cal. June 30, 2014) (convenience of witnesses weighed "strongly in favor of transfer" where defendant listed five potential witnesses in transferee district and plaintiff identified none in transferor district); *George v. Nat'l Collegiate Athletic Ass'n*, Case No. 08-cv-03401, 2008 WL 5422882, at *4 (C.D. Cal. Dec. 17, 2008) ("Plaintiffs' failure to produce a witness list suggests that Plaintiffs' contentions regarding such witnesses are speculative."); *Arete Power, Inc. v. Beacon Power Corp.*, Case No. 07-cv-05167, 2008 WL 508477, at *9 (N.D. Cal. Feb. 22, 2008) (transferring case after evaluating list of non-party and party witnesses proffered by defendant); *Maxon v. Jefferson Pilot Sec. Corp.*, Case No. 01-cv-02668, 2002 WL 523575, at *4 (N.D. Cal. Apr. 2, 2002) (transferring case after evaluating list of potential witnesses submitted in declaration).

The remaining factors do not change the result. Plaintiffs note that, although some Defendants do reside in Iowa, others are based in the United Kingdom, Bermuda, Delaware and California.[75] Similarly, officers and other employees for these companies are scattered around the world, including in California.[76] None of these companies or employees, however, is located in this district.[77] Even the ones in California reside in the Central District.[78] All of these connections, therefore, are irrelevant to the transfer analysis.

So is Plaintiffs' evidence that Defendants sell more annuities in California than in any other state.[79] Leaving aside the fact that Plaintiffs conflate California with this district, Plaintiffs' argument would mean that most nationwide class actions could be brought here.[80] Section 1404(a) cannot require such a result. Plaintiffs also observe that party witnesses can be compelled to appear in this district and that electronic discovery has reduced the cost of producing documents across jurisdictions.[81] True, but these facts do not eliminate the inconvenience to Defendants from

---

[75] *See id.* at ¶¶ 18, 22-25.

[76] *See* Docket No. 72-20 at 3-8; Docket No. 72-21 at 6-9.

[77] *See Pavao v. Unifund CCR Partners*, 934 F. Supp. 2d 1238, 1243-44 (S.D. Cal. 2013) ("The mere fact that [a] [d]efendant . . . may have sufficient jurisdictional contacts to reside in this district for venue purposes does not establish that [it] is the most convenient venue.").

[78] *Cf. Graham*, 2014 WL 5528402, at *5 (transferring case from Northern to Central District of California); *Foster v. Nationwide Mut. Ins. Co.*, Case No. 07-cv-04928, 2007 WL 4410408, at *4, 7 (N.D. Cal. Dec. 14, 2007) (transferring case to Southern District of Ohio after noting that defendant's California offices in Sacramento, Camarillo and La Mesa were not located within the Northern District of California).

[79] *See* Docket Nos. 72-14, 72-15, 72-22, 72-25, 72-26, 72-27, 72-28, 72-29. This also means that more putative class members live in California than in any other state.

[80] *Cf. Italian Colors Rest. v. Am. Express Co.*, Case No. 03-cv-03719, 2003 WL 22682482, at *3 (N.D. Cal. Nov. 10, 2003) (quoting *Ho v. Ikon Office Sols., Inc.*, 143 F. Supp. 2d 1163, 1167-68 (N.D. Cal. 2001)) ("[A]s the most populous state in the country, California has a disproportionate share of many economic activities. By this logic, . . . 'virtually every significant class action case would need to be litigated in California,' a logic that has been repeatedly rejected.").

[81] *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, Case No. 09-cv-03329, 2009 WL 4899217, at

12
Case No. 15-cv-02665-PSG
ORDER GRANTING MOTION TO TRANSFER VENUE AND DENYING WITHOUT PREJUDICE MOTIONS TO DISMISS

maintaining the action here.[82] The other factors—the states' familiarity with the governing law and the modest projected differences in litigation costs and court congestion[83]—do not tip the scales either way. On the whole, Defendants have made a compelling showing that the interests of justice require transfer to the Southern District of Iowa.

## IV.

Defendants' motion to transfer under 28 U.S.C. § 1404(a) is GRANTED. Their motions to dismiss are DENIED without prejudice. This lawsuit shall be transferred to the Southern District of Iowa.

**SO ORDERED.**

Dated: March 25, 2016

_____
PAUL S. GREWAL
United States Magistrate Judge

---

*2 (N.D. Cal. Dec. 11, 2009); *Foster*, 2007 WL 4410408, at *3-6.

[82] *See Roe v. Intellicorp Records, Inc.*, Case No. 12-cv-02567, 2012 WL 3727323, at *3 (N.D. Cal. Aug. 27, 2012).

[83] The median time from filing to disposition in civil cases for the year ending March 31, 2015, was 8.1 months in the Southern District of Iowa, compared to 7.9 months in the Northern District of California. *See* Table N/A – U.S. District Courts – Combined Civil and Criminal Federal Court Management Statistics (March 31, 2015), *available at* http://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2015/03/31-2.

13
Case No. 15-cv-02665-PSG
ORDER GRANTING MOTION TO TRANSFER VENUE AND DENYING WITHOUT PREJUDICE MOTIONS TO DISMISS